Thank you, Your Honors. I'm Doug Doris, and I represent one of the appellants in the case. In this case, Gerald Head, my co-counsel, and another appellate counsel is Mark Prince. He's here at the table. He represents the Donkins. We've agreed that because it's going to take the entire 20 minutes, because this case is heavy on numbers and on formulas, I have taken the liberty and asked the lead of the court to submit to you handouts. They're in front of each of you that are replicas of what appear in the briefs already, but this might make it easier for you to find what I'm looking at. It might help guide me through the argument as well. Your Honor, this is a Jaynes appeal. This is the kind of a case that this court has set the standard for in the Jaynes v. Western States opinion in 2001. The panel in that was Justice Charles Chapman, Justice Welch, Justice Goldenberg. It's the kind of case that arises when several occupants of one vehicle are injured in a single wreck. The amount of their claims exceed the amount of underinsured coverage that's available on the host vehicle, and the trial court is faced with the dilemma of how to divide up that host vehicle, the funds on the host vehicle, the UIN funds. In this particular case, the appellants believe that Judge Ekus, in trying to apply Jaynes, applied an inappropriate ratio method, which is not endorsed by or allowed under the Jaynes standard, under the Jaynes formula. To understand the appeal, I need to go through the insurance that was available in the present case, revisit the Jaynes case in some detail, and then argue how I believe that the Jaynes formula should have been applied in the present case. In this case, Your Honor, and this is called Diagram 1 in the patent. You might be able to see this. Basically, there was a host vehicle that held four occupants. The driver was an adult. Katharine Duncan, her son-in-law Duncan, was in the vehicle next to her. Michael Heron was in the back seat, and Jerry Head, my client, was in the back seat. A vehicle driven by Brian Rand, who came through a rural stop sign, T-Bone, the host vehicle, tragically threw Michael Heron and Jerry Head out the back of that vehicle. Michael Heron lost his life in the accident. The trial court was confronted with the issue of how to divide up the— by the way, Duncan was also hurt in the front seat. Jerry Head suffered through several knee operations. He's going to have to have an artificial knee and several transplants during his life, or replacements during his life. That was the basis of our suit. The insurance would be divided up. The roster goes like this. The insurance on the Duncan host vehicle, after some litigation, after appeals to this court involving stacking and settling, it was determined as a matter of law that the encompass insurance provided 300,000, stacked three times, to 900,000 on the host vehicle. That new I.N. coverage on the host vehicle from the coast covered all the occupants of the host vehicle. That, in fact, was the only underinsured coverage that was going to be available, that is available for the Duncans, are Jerry Head. Jerry Head's family had their own underinsurance, but it was 100,000. That was the same number as the Williams-Columbia insurance, which was the court-feasored liability insurance. So those basically canceled out Madison and had the underinsured on these heads, took the position that there was no underinsured coverage. Dr. Roger Heron is the father of Michael Heron. Dr. Roger Heron owns nursing homes. Two of the nursing homes he owned were in his own name. Insurance policies issued to him were for Dr. Roger Heron, DBA. Through litigation, we were able, all parties participated, and we were able to create a pool of underinsured coverage that covered a member of his family, Michael Heron, to the tune of $5.5 million home. That was his Cincinnati insurance withdrawal, that was his own vehicle coverage, plus the two nursing homes. They intrastacked, intrastacked to provide $5.5 million coverage. It is undisputed that that $5.5 million in underinsured from Roe, Heron, King, and Cincinnati covers only Michael Heron. He is the only one that can have access to that coverage. The $100,000 on the tort-feasored driver, Jim Wyer, by the way, has it included there. He's going to be appearing in this. But the $100,000, Mr. Wyer came to the court. Trial Judge Ekus was then faced with the dilemma of how do we provide $100,000 bodily injury liability coverage. It was done in the standard fashion that's been done for years where there's multiple claims. A trial was had in this case, an aggrieved bench trial. The court set figures, Judge Ekus set figures after the bench trial as to the amount of damages that each of the occupants of the W. Ekus facility by the way provided in that trial. The only insurance available for the Dunkins is indeed the insurance policy that they bought for their own family. By nature of this kind of case, the owners of the host vehicle usually will only have the insurance that's available that provides the common pool of URI coverage on the host vehicle. Judge Ekus conducted his bench trial. He came up with the following figures. That's on page 32 of the brief. It's starting on your handout. The extent of Michael Cameron's reward was $10 million, over $10 million. The other occupants of the vehicle who did not have any outside sources of underinsured motorist coverage received awards that totaled $955,000. My client, Jared Head, received an award from Judge Ekus of $633,000. The dilemma of Judge Ekus then at that point was that he had to apply those figures to the $800,000 that was available under the UIN policy because all the parties were covered. They were insured under the host vehicle. They were missed occupants of the vehicle. They were all covered. Well, that brings us to James. This court was confronted with a very similar situation in James. Before I get into James, which I won't get into yet, I need to give you one other development in this particular case. After the bench trial, the court ordered mediation. The parties went to Chicago. Mediation occurred. During the mediation, Dr. Roger Heron, the administrator for the state of Michael, agreed to sell his underinsured claim against his own coverage, his nursing homes in Cincinnati, New Jersey. That was his only appeal. He agreed to sell it for $1.65 million. That left $3.85 million that was potentially available only to Dr. Roger Heron, his administrator, on the table. In other words, he received $1.65 million. I'm not critical of that settlement, by the way. His argument is that they wanted to avoid further appeals for the litigation. I'm sure the thought occurred then they might not do better than that in underinsured arbitration on that case. But anyway, they accepted $1.65 million, leaving $3.85 million. Judge Eberstein was concerned with that situation and had to determine how to divide up the $800,000 that was still there to be distributed from the host vehicle, U.N. income. It's $800,000, of course. It's $100,000 randomly dictated to the courts so they can settle. So how do you divide up the $800,000? That's James. That's precisely the issue that this Court of Appeals, the huge injustice it's had. Let me ask you this. James, I believe, was decided in 2001. Yes. This was decided, Judge Ickes' decision came down in 2002? No. When? No, Judge Ickes' decision on how to deal with that came down in 2009. Okay, 2009, after James. Well after James. All right. And am I correct that under James, those with a separate source of UIM coverage should access their coverage first before they participate in the host common pool? That's exactly right. Okay. So did you argue James to Judge Ickes? Both sitters. Okay. Both sitters. And for a long time, for years leading up to this, there were appeals leading up to this. We brought up James from the earliest beginning, and that was one of the main reasons why we strove so mightily to create this pool of insurance, hoping that by creating a large pool of insurance, the debt case could be paid out of this pool of insurance, leaving some of this, the whole scheme of it, reminding the mayor to compensate the young people who had to buy insurance. Judge Ickes, though, did not use that simple formula. He used a ratio formula where what he did was he took the amount of insurance that Dr. Herod had received, 1.65 million, divided that by the total amount of all the damages he found, 10.11 million, came up with a percentage of 16%, and then multiplied that against the 800,000 that was remaining. Now, that is a simplified way of saying that there was another step in there. You have to read his December 4 decision, the goal with all the permutations. It is a very difficult formula that would be very difficult to replicate by other trial judges in the future, but that's basically what he did. When Judge Ickes finished, he and Morgan Heron stated, of the 800,000, 677,000, that's 75%. And, for example, my client, who had a 677,000-dollar award, only got 147 when you take away the money from the host vehicle coverage that Dr. Heron also received. Our problem was that there was 3.85 million underinsured that Dr. Heron chose not to pay, and yet he wanted to come in and participate fully and take the lion's share of the host vehicle money. Judge Ickes agreed with that. He used the ratio method. I think the ratio method has been rejected by this court when it first had James. James was also a tragic case. There were six people involved in the van. They were teachers in Carterville. A tour business named Phelps came across the center line, killed five out of the six in the vehicle. Judge C. David Nelson was the trial judge when that occurred on that case. There was staffing involved in that. The James host vehicle had 300,000 after-staffing coverage available. Actually, a few policies, just like in this case, there was 350, but the court fees of Phelps had 50, so that reduced the underinsured payable to 300. Judge Nelson had to divide up 300,000. There were six claimants. One survived, Linda James, horribly injured. Her case was worth a lot of money. Everybody agreed that every one of their six cases exceeded 300,000. Good people. Good people. What Judge Nelson did, basically, is set six claims, 300,000 by 300,000 by six. That's 50,000 each. And from the host vehicle, you and I had to get each part of $50,000. The problem was, what he overlooked, and what this court corrected, was that the Harrisons in the churches had outside insurance available exclusively to them. In other words, their own family's policy. The Harrisons had 50,000 each that they received from the outside underinsured. The churches had 100,000 each from their outside underinsured. And so when Judge Nelson's formula was used with 50,000 each, there turned out to be an inequitable distribution with all of the insurance, both outside underinsured and the common pool host vehicle insurance was divided up. All five people were there, all the claims were the same, and yet some of the people ended up less than other people. So, the next chart that I need to refer to is in the handout. I put it in front of you. This chart, it's actually page 28 of the brief, which shows exactly how this court rectified that situation. You reversed what Judge Nelson did. Here's what you did, and I think Justice Lexen summarized it perfectly. The underlying theory of Janes, I think the genius of Janes, is that you require the parties that have outside sources of UIM coverage to access that first, to in essence exhaust that first, before they can come in and participate with the only coverage that's available to the people who bought it on their host vehicle. So, what this court did in Janes is they determined... Here's the key language. I'm about out of time, so I'll go quickly. You held, in determining the amount of underinsured motorist coverage, I'm reading from Janes, a court should hypothesize that the tortfeasor had insurance in the amount of the policy of the not-at-fault vehicle owner. Similarly, in the distribution of the underinsured motorist insurance funds, a court should also hypothesize that the tortfeasor had liability coverage commensurate with all underinsured motorist coverages applicable to the accident. Doing so requires us to look first at the underinsured motorist policies of the passengers, as there is no question that the distribution under those policies goes directly to the policyholders. According to the plaintiff, the Harris's had $50,000 each of their own policy. The churches would receive $100 each of their own policy. In attempting to fill the gap, the court should first make a determination of the amounts due under these policies. The court should then fill all in the remaining gap with any coverage on the occupants of the vehicle provided here by the Janes policy. This process best allows underinsured motorist coverage to fill the gap. Any other approach does not account for all the underinsured motorist coverage that was purchased. By the way, that's my account, too, which is Judge Ickes, and if you do decide you can use ratios, which I oppose, but if you do decide the ratio method was correct, Judge Ickes used 1.65, the amount that they received, not the 5.5, the amount that was available. That skewers the percentages, and obviously the people without insurance get less. But my argument is that you should not use ratios just like you did in the original case. You also said by determining the amount to be paid after the individual policies of the occupants are accounted for, the gap can be filled. Similarly, in this case, we ruled that policies specific to the passenger in a vehicle should be looked at prior to the distribution of the owner's underinsured motorist coverage among the occupants. The court then determined, in Chart 4, that Phillips, Jane, and James should get $100,000. That all came from the host vehicle underinsured policy. That's because he had nothing of his own coverage, and because Harris's had $50,000 and the Church's had $50,000. The court further determined that the Harris's should each get $50,000 to bring them up to the Church's. They had $50,000 of their own. The court added $50,000 to the UIN host vehicle, which gave the Harris's each $100,000. The key thing about James, and the reason I'm torturing myself through the numbers, is this court found that the Church's got zero from the underinsured common fund, not common fund, but the common pool of insurers available on the James's host vehicle. Does that seem wrong? No, because like in this case, the Church's and Dr. Heron bought a specific amount of underinsured coverage, $5.5 million for Dr. Heron, $100,000 each for the Church's. That's exactly what they got. They got the benefit of their bargain, and the court required that they exhaust their policies, and the court, before allowing them to participate in the distribution of the host vehicle UIN coverage, they first allow the people who had no coverage to be brought up to the same footing. Our argument at the end of the day is that the distribution under James, applying James, will result in the Harris estate taking up to the $800,000 for the key reason that the Harris estate had more underinsured coverage, $5.5 million. They also received more underinsured settlement, $1.65 million, than the $800,000 that is available. Those are great requests. Thank you. Counsel? The issue that is ignored here is the fact that the amount of underinsured coverage, by all these other policies, was still in dispute. There was a trial for it, but in order for Heron Estate to have been able to acquire more money under the underinsured coverage on those policies, would have required three or four more trials, arbitrations, appeals, all different types of things. The claim that that money was available is not true. They settled so there was nothing more available. I'm sorry? They settled with their own insurer, so they had nothing more to access. Is that your argument? No. At the time they settled, the amount of the coverage was in dispute. You're talking about the policy coverage and the policy. Those companies vigorously disputed whether it applied, whether it was there or not. We would have had to have finished the trial against those companies and the appeal against those companies before that issue could have ever been resolved. And we're talking about a death that occurred in 2001 of the son, the only son of this young, of the mother. We've been here, this is the fourth time we've been to this court on issues in that case. And the Heron Estate, the Heron family had to decide whether they would pursue that and may or may not win on the amount of coverage. It is not taken, it is not a given, it is not clear, it's not fact that there was $5 million available. Policy said that. Policy was subject to dispute, subject to argument. And that's the part that you cannot ignore. What was the dispute? I mean, the policy said $5 million. It was all kinds of disputes, Judge. The policy belonged to a company, not to the individual. The question was whether the son came in. There was all kinds of coverage issues under those policies. It was vigorously fought, would have been vigorously argued before this court. And that issue, then, was before the court when the court approved this settlement. And then those companies were taken out of the case. And then the court, over objection by these two other plaintiffs, allowed the $800,000 to be paid into court. And then that company's out of the case. We sort of just ignored the fact that there's a necessary party missing from this litigation. Encompass is no longer here. Encompass is the entity that had language providing for arbitration. That language says that each party shall select a competent and impartial arbitrator. Those two shall select the third. Ain't nobody there on Encompass's side. They're gone from the case. They're gone with prejudice. No appeal of that decision. Counsel cited the Skidmore case in his brief, which says that an insured party has rights, absolutely. But the case, he cites, includes the insurance carrier. You cannot show me a case in the books in Illinois anywhere where there's been a decision interpreting insurance policy and coverage without the insurance carrier being there, being involved in the case. Now you're asking this court to impose arbitration on a policy held by an insurance company that is no longer in the case, was in the case, could have been kept in the case, could have appealed that decision. Did not. That party's gone. A necessary part of this action is not here. You've got a necessary party missing. You have a dispute about the amount of coverage. In fact, the policy says that and the trial just said it. It just doesn't make it so. It doesn't end it. And the issue you've got to decide is, in a case like that, does any party have a right to settle, or do they have to pursue the full amount of coverage? And I don't think there's, I mean, the public policy in trying to settle disputes requires something. To say that in this case, the Herron family had an obligation not to settle but to pursue the entire amount of the claim, I don't believe there's any case law and there's no public policy anywhere that supports that kind of position. We're just deciding whether the trial court properly applied, James. There's no cross-appeal on whether or not they should have pursued the entire $5 million. We're here to decide whether or not that money paid to Dr. Herron's estate or mother must first be set off before he can participate in a common pool. That's the only issue. Well, there are lots of other issues there. But just taking that issue, I think you get the point. Are you saying, then, that the amount of coverage on the policies themselves controls the amount of money paid? And how do you do that? How do you make the Herron estate go through all this additional litigation to establish that kind of money? Where's the public policy pertaining to settling cases and resolving differences? Judge Ickes, this nonsense about ratio, I've heard that repeatedly. There was no ratio here. Judge Ickes decided that if this had gone to arbitration, some arbitrator or a group of arbitrators would have decided total amount of damage as to how to divide that up. That's exactly what Judge Ickes did. But you're accepting, without any basis for it at all, a claim that there was, in fact, $5 million there, and they left it on the table, when that was obviously a dispute. If they had tendered $5 million and said, oh, we don't want it, that's a different story. But that's not the facts yet. You've got a vigorously disputed, vigorously contested argument. We've been at this for over 10 years. We've been to this court three, I think, four times now. In one of those cases, and talk about the fear of litigation and what can happen. In one of those cases, the attorney for the insurance company, in argument, in oral argument before the court, admitted that there was no issue about stacking. Sacking was an issue in the case, and then this court, in an order, saying stacking of $500 versus the trial judge's decision. There is risk involved in litigation. That was corrected, finally, with a motion to reconsider. There's risk involved in litigation. There's a reason to settle. You cannot accept as gospel that that is, in fact, that there was $5 million on the table. It wasn't there. It wasn't a case where they had, that we have $5 million, and we're not going to take it. We don't want it. It's a case where the insurance company is saying, we don't have that kind of coverage. We're not going to pay that kind of money. They never offered that kind of money. Do we take what they offer, or do we litigate? And their case was settled. So that's an issue that you can't just accept on faith that there was that kind of money there, and that has been ignored. That's just not true. You can't ignore the fact that there's a necessary part in this. Encompass is a necessary part of this case. They are no longer here. Counsel says that what Nika should have done was order arbitration. How? Under what policy? Who would have stood in for Encompass and picked an arbitrator? How do you accomplish that when they're not here? So you look at what Nika did and what was masterful in compliance with James and in compliance with all of his court's law and policy. He took the facts that were available and divided it up. He had a hearing, first of all, which everybody consented to. There was not any objection to that hearing on the damages. And then he makes a decision about damages. And there's not a case in Illinois that says that a review of a decision on damages is anything other than based on the abuse of discretion. The decision that there was no ratio being done. He didn't divide it up by parties. He heard the facts of the case. He heard the evidence. He considered it and reached an opinion about damages. And then he decided, based on all the law that he applied, the amount of money that was actually available, the amount of money that they settled for, actually available under the insurance, gave credit to the other parties for that amount of money, and then divided the rest up. And you talk about, according to his decision, the $10 million or $5 million, whatever his judgment was, about the loss of his child, the parent escape got less percentage-wise than anybody else. But the issue here is, do they have the right to settle, or are they obligated to go by the language in the policy in deciding how to do it? And can you force this estate to go through four or five different lawsuits, more appeals to the two of them? I think, in this case, that was wrong. He could recognize that was wrong. And I think his decision was correct. Thank you. Thank you, Counsel. Counsel? The still-standing issue remains of why did not Judge Ickes require that the occupants of the Duncan vehicle be placed on the same footing before Dr. Heron could begin participating in the $800,000, as had been mandated by this Court in the James case? Mr. Womack argues that there was no final determination of $5.5 million. There was an order by the circuit court stacking intra and inter the $5 million of the policies on the nursing home. Yes, they could have appealed it somewhere down the road, but that is inherent in any lawsuit, in any situation. There can be issues out there that might be raised as an appeal. We cannot allow Judge Ickes to ignore the precedent of James on the basis that there might have been more litigation, there might have been more appeals. That will always be the situation. The truth is, whatever you think might have happened, $1.65 million was paid. $1.65 million from the nursing home policies and from the Heron's own policies is more than the $800,000. That's the end of the inquiry, I think, as far as James goes. We are never, the people that were in that car that had no outside source of under-insurance, including the Duncans who bought that policy to cover their own family, their interest in their own policy is being whittled down while $3.85 million is sitting out there that was not access, access that was available for the Heron, for Dr. Heron's family. You don't dispute that Dr. Heron's family had a right to settle their case for less than the amount of the $5.5 million. They absolutely did. I completely agree with that. That's their discretion. I'm not criticizing the settlement either. But I'm saying under the genius and the theory of James, the James court said, go out and access your own policies before you come in and participate in the common fund. Let's get everybody paid as much as we can. Let's access all the outside policies. You can't walk away from your own policy and come in and then try to take most of the remaining policy when you still have some left over. Even if you decide to ignore the $5.5 million and instead use, like Judge Incas did, the $1.65 million, $1.65 million is still more than $800,000. So the set off, putting us on equal footing requires that Dr. Heron cannot participate in the $800,000, the dividing up of the $800,000 host vehicle. Again, that seems harsh, but he got the benefit of $5.5 million in coverage and he got the benefit of $1.65 million settlement. He could have arbitrated if he wanted more. He could have arbitrated more. The argument about this not, that when Encompass paid its money in the court that it no longer was a necessary party and we can't arbitrate, again, that's an arbitration issue. That's issue three. I don't even think we need to get to issue three to determine the application of James, but even if you do, clearly what happened here is the walking away of Encompass when they said, we've been to this court, this court said it's taxed, this court said you owe the whole $800,000. They looked at the case, the Encompass attorneys looked at the case and said, we're not going to participate in any more arbitrations. Why pay money? All our $800,000 is gone. They simply went to Judge Incas and said, here's the $800,000, now let us out. Judge Incas, in his discussion, he's quoted in my brief, said very clearly to them, you just want out. You don't want to be part of the arbitration. You just want out. Yes, that's it. And I think they said words to the effect that that's beautiful. We just want out. Can we go forward with arbitration without the insurance company? Certainly we can. The heads pick an arbitrator, the numbers pick an arbitrator, Karen picks an arbitrator, you have a panel of three arbitrators, you put your evidence on the two panels, the panel of three decides the arbitration case. Encompass is not there to dispute it. Encompass doesn't care. They pay their $800,000. We certainly can go forward. If you buy Mr. Wong's argument that any arbitration clause is revocable in this state, if one party simply says, I'm not going to participate, then his argument is, well, the contract's thrown away. No, it's not. It's still there. And the people who had an interest in the contract, everybody, including Dr. Heron, has demanded arbitration in this case. For them to argue that there was no racial abuse by Judge Yicus, I implore the court to please look at his decision on 12-4-2009. It's in the supplemental appendix. The supplemental appendix is on A2 through A7. There are tables of Judge Yicus going through percentages in deciding that the Heron estate gets 91.29, Dr. Geragate gets 5.78, Captain Duncan gets 1.42. He goes through the checks of percentages. Mr. Wong has argued that the Heron estate got less. They got exactly the same as everybody else, 22.25 percentages. While Judge Yicus is trying to shoot for it, I think the court should try to apologize or should apply James. It's a good law. In fact, it's the only law out there on the subject. Thank you. Thank you, counsel. I appreciate the brief arguments from counsel. We will take the case under advisement.